IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHAUCER CORPORATE CAPITAL, NO. 2 LIMITED | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:10-cv-00180 |
| HARDAM S. AZAD D/B/A FIVE MILLION SQUARE FEET COMPANIES; HOUSTON SHOPPING CENTER MANAGERS, LP D/B/A COM REALTY AND SOUTH VILLAGE SHOPPING CENTER; CONTINENTAL BALLROOMS, INC.; TRADING FAIR IV, INC.; TRADING FAIR III, INC.; TRADING FAIR HOUSTON, INC.; THE TOMBALL CENTER, INC.; AND WEBSTER/MARINAGATE, INC. | § § § § § § § § § § § | NON-JURY TRIAL

JUDGE EWING WERLEIN, JR. |
| Defendants. | § | |

## AMENDED COMPLAINT

COMES NOW Plaintiff Chaucer Corporate Capital No.2 Limited, on its own behalf as lead underwriter of those Certain Underwriters at Lloyd's, London severally subscribing to Policy No. AMR-21528 ("Chaucer") and, pursuant to this Court's January 15, 2010 order, files this its Amended Complaint and would respectfully show unto this Court as follows:

## PARTIES

1.     Chaucer is a British citizen, being a British corporation incorporated in the United Kingdom and with its domicile and principal place of business in the United Kingdom.

2.     Defendant Hardam S. Azad, individually and d/b/a Five Million Square Feet Companies ("Five Million Square Feet"), is a citizen of Texas.  Summons and service may be had

upon Five Million Square Feet by serving Hardam S. Azad at 720 North Post Oak, Ste. 260, Houston, Texas 77024 or in the alternative 110 Carnarvon Drive, Houston, Texas 77024.

3.      Defendant Houston Shopping Center Managers, LP d/b/a Com Realty and South Village Shopping Center ("Houston Shopping Center Managers") is a Texas Limited Partnership. Summons and service may be had upon Houston Shopping Center Managers by serving Hardam S. Azad at 110 Carnarvon Drive, Houston, Texas 77024.  The general partner of Houston Shopping Center Managers is Houston Shopping Center Managers I, LLC which is a limited liability company organized under the laws of the State of Texas.  The limited partners of Houston Shopping Center Managers are Hardam S. Azad, Jagdesh Kaur Azad, Manohar Singh Mann, and Balwinder Kaur Mann all of whom are residents of Texas and, upon information and belief, citizens of Texas.

4.      Defendant Continental Ballrooms, Inc. ("Continental Ballrooms") is a corporation organized under the laws of the State of Texas and is a citizen of Texas.  Summons and service may be had upon Continental Ballrooms by serving its registered agent Hardam S. Azad at 110 Carnarvon Drive, Houston, Texas 77024.

5.      Defendant Trading Fair IV, Inc. ("Trading Fair IV") is a corporation organized under the laws of the State of Texas and is a citizen of Texas.  Summons and service may be had upon Trading Fair IV by serving its registered agent Hardam S. Azad at 110 Carnarvon Drive, Houston, Texas 77024.

6.      Defendant Trading Fair III, Inc. ("Trading Fair III") is a corporation organized under the laws of the State of Texas and is a citizen of Texas.  Summons and service may be had upon Trading Fair III by serving its registered agent Hardam S. Azad at 110 Carnarvon Drive, Houston, Texas 77024.

7.     Defendant Trading Fair Houston, Inc. ("Trading Fair Houston") is a corporation organized under the laws of the State of Texas and is a citizen of Texas.  Summons and service may be had upon Trading Fair Houston by serving its registered agent Hardam S. Azad at 110 Carnarvon Drive, Houston, Texas 77024.

8.     Defendant The Tomball Center, Inc. ("Tomball Center") is a corporation organized under the laws of the State of Texas and is a citizen of Texas.  Summons and service may be had upon Tomball Center by serving its registered agent Hardam S. Azad at 110 Carnarvon Drive, Houston, Texas 77024.

9.     Defendant Webster/MarinaGate, Inc. ("MarinaGate") is a corporation organized under the laws of the State of Texas.  Summons and service may be had upon MarinaGate by serving its registered agent Hardam S. Azad at 110 Carnarvon Drive, Houston, Texas 77024.

## JURISDICTION AND VENUE

10.     There is diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Chaucer is a citizen of the United Kingdom and defendants are citizens of Texas.  Further, the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

11.     Venue in this district and division is proper pursuant to 28 U.S.C. § 1391 since all of the Defendants reside in this judicial district, and this is the judicial district in which the property that is the subject of the action is situated.

## FACTUAL BACKGROUND

12.     Chaucer caused to be issued a policy of insurance to Five Million Square Feet Companies, Houston Shopping Center Management, Inc. (converted to Houston Shopping Center

Management, LP), Com Realty (an assumed name of Houston Shopping Center Management), Continental Ballrooms, Trading Fair IV, Trading Fair III, Trading Fair Houston, Tomball Center, South Village Shopping Center (an assumed name of Houston Shopping Center Management), and Webster/MarinaGate as named insureds under policy number AMR-21528 effective September 18, 2007 to September 18, 2008 (the "Policy").  The Policy insures various properties in the Houston area for property damage and business interruption losses.

13.     On September 13, 2008, Hurricane Ike struck the Houston area.  Thereafter, Five Million Square Feet sent a property loss notice for alleged damage to six properties insured by the Policy as a result of Hurricane Ike.  Chaucer appointed independent adjusters to inspect the property and to begin the process of determining the damages caused by Hurricane Ike.  By October 2008, the independent adjusters had made an initial inspection of all six properties and made preliminary determinations about the condition of the properties, although the task was far from complete.  At the same time, the independent adjusters were gathering or attempting to gather facts and information from Defendants through their public adjuster, Balance Loss Consultants.  Despite the fact that the Policy contains substantial deductibles, Chaucer approved advance payments to Defendants for use in restoring the properties and repairing the damage caused by Hurricane Ike.  Thus, on November 20, 2008, Chaucer's adjusters advanced to Defendants a payment of $1 million.  On December 31, 2008, Chaucer advanced an additional payment to Defendants of $636,874.34.

14.     One of the properties that was damaged was 630 West Little York in Houston ("Trading Fair IV").  Trading Fair IV is an indoor flea market of concrete block construction approximately 40 years old.  Chaucer's independent adjusters determined that the roof of the building was compromised and interior water damages existed.  The independent adjusters immediately recognized the need for emergency repairs to protect Trading Fair IV from further

damage.  The independent adjusters located a local contractor, Village Contractors, Inc. ("Village Contractors"), that was willing to perform emergency repairs to stop water coming in through the roof pending replacement of the entire roof.  Village Contractors was also available to take all necessary steps to remove water and moisture from the interior of the building in order to protect it from further damage. The contractor indicated to both the independent adjusters and Defendants' representatives that it was ready, willing and able to replace the roof with a roof of like grade and quality following the emergency repairs and completion of the drying process.

15.     Defendants hired Village Contractors to perform emergency repairs to the existing wind-damaged roof system.  The cost of such repairs was $29,500.  In addition, Village Contractors, through one of its subcontractors, Mobile Dry Force, LLC, performed dehumidification and drying services calling for the installation of high static blowers, air movers, and mobile drying units.  The equipment was run continuously to insure rapid controlled drying.  Village Contractors monitored the project daily and, at the end of the drying and dehumidifation process, checked the building for moisture content to insure that excess moisture was removed, thus saving the interior of the building from complete demolition.  In addition, Village Contractors removed ceiling tiles in the building and, in general, took those steps necessary to avoid further damage to the building, including hiring a security guard around the clock.

16.     Defendants, by and through their designated representative, signed the contract with Village Contractors, on September 23, 2008, just ten days after Hurricane Ike.  Village Contractors completed its work on or before October 16, 2008.  At the time of completion of the project, and in accordance with the terms of the contract, Village Contactors, through Mobile Dry Force, LLC, checked the condition of Trading Fair IV to insure that the interior of the building met applicable dry standards.  Mobile Dry Force, LLC duly inspected the building and used electronic testing to

measure moisture and humidity.  In fact, Mobile Dry Force and a representative of Trading Fair IV inspected the building on October 6, 2008, to confirm that the work had been satisfactorily completed and that the building met or surpassed the dry standard.  Moreover, a representative of Trading Fair IV signed an acknowledgment of acceptance on that date and also received a copy of Mobile Dry Force, LLC's report detailing the work done and the results of its work.

17.    At the time of their initial inspections, the independent adjusters determined that cooling towers for Trade Fair IV needed to be replaced.  The independent adjusters took steps to locate replacement cooling towers and a contractor that would install them.  In fact, the independent adjusters met with Balance Loss Consultants on or about October 31, 2008, at which time the adjusters agreed to accept the public adjuster's roofing estimate although it was somewhat higher than their own consultant's estimate.  The adjusters also agreed to Defendants' proceeding with purchasing the cooling towers.  Instead, Defendants and their public adjuster chose to neglect the building, and forego roof replacement and replacement of the cooling towers.  As a result, the property suffered further damages for which Defendants now have made a claim.

19.    Defendants' conduct followed the same pattern on most, if not all, the remaining properties.  As with Trading Fair IV, the independent adjusters made their initial inspections of such properties in September 2008.  The independent adjusters used their best efforts to estimate the damages caused by Hurricane Ike and employed construction consultants to assist them in the adjustment process.  As result of their inspections, the independent adjusters recommended advances to Defendants to be applied against the cost of repairs necessary as a result of Hurricane Ike.  The independent adjusters met and attempted to meet with Defendants' public adjusters on several occasions to discuss the scope of damages and to reach an agreed scope of damages.  For instance, the independent adjusters had a conference call with the public adjuster on November 20, 2008 to

discuss areas of agreement and disagreement on the scope of damage at the various properties.  The public adjuster provided amounts that Defendants would agree to and presented those amounts as Defendants' claim for settlement of losses to all properties.  However, the public adjusters did an about face the next day and provided new figures that had no relevance to the amounts discussed less than 24 hours before.

18.     During the course of the adjustment process, there was disagreement over whether roofs at properties other than Trading Fair IV were damaged by Hurricane Ike, and, if so, the scope of reasonable and necessary repairs.  The independent adjusters hired engineers to inspect the roofs and report on causation.  However, the Defendants' public adjuster did not always cooperate with the engineers, broke existing appointments, and did not attend scheduled meetings.  Such inspections were important because the policies have certain conditions and exclusions which must be investigated and determined prior to payment of any loss, including Defendants' claimed losses.

19.     The independent adjusters' inspections had determined that there was little or no damages from Hurricane Ike either to the roofs or to the interior spaces of some properties.  However, Defendants' public adjuster claimed that, in addition to Trading Fair IV, most, if not all, the properties required entire roof replacements and that there was significant interior damages.  Defendants' public adjusters submitted various figures to the independent adjusters, changed those figures, and eventually began submitting written estimates reflecting steadily increasing costs of repair.  Moreover, Defendants' public adjuster's estimates were not timely delivered to the independent adjusters despite repeated requests for such estimates.

20.     By letter dated January 22, 2009, Defendant Azad demanded an appraisal of the actual cash value and replacement cost value of the loss and submitted a proof of loss for over $11 million which, after applicable deductibles, resulted in a claim of $9,396,748.  The proof of loss was rejected

on February 12, 2009, and thereafter, Chaucer caused to be appointed an independent appraiser to determine the RCV and ACV of the claimed loss in response to Defendant Azad's demand for appraisal.

21.     Defendants chose and appointed their appraiser.  Chaucer did likewise.  The two appraisers, in accordance with the terms of the Policy, selected and agreed to an umpire.  The chosen appraisers met and began their inspections on April 2, 2009.  The appraisal process continued after that.  On May 26, 2009, it appeared that both appraisers had agreed on the scope of damages to Trading Fair II, Trading Fair III, and Trading Fair IV, including any temporary and emergency repairs.  However, according to Chaucer's appraiser, Defendants' appraiser reneged on the agreed scope of damages during a meeting on or about August 4, 2009, where Defendants' appraiser advised that he could not stand by the agreements previously made as his client would not agree to the appraised damages.  Defendants deny that an agreement was ever reached.

22.     Out of the advance payments to Five Million Square Feet in November 2008, five of the checks were made jointly payable to Five Million Square Feet and Village Contractors for the emergency repair work in the amount of $338,382.00.  Five Million Square Feet never cashed those checks and never issued payment to Village Contractors or Mobile Dry Force.

23.     In the meantime, Village Contractors sued Five Million Square Feet and other related entities for payment of work performed pursuant to the contract authorizing emergency repairs and the protection of Trading Fair IV from further damage.  On August 21, 2009, after learning of this dispute, Chaucer filed an interpleader action in this court, Cause No. 4:09-cv-02701, to deposit funds payable under the contract in the registry of the court.

24.     During the pendency of the interpleader action, which also included a breach of contract claim and a complaint for declaratory judgment and other relief, Defendant Azad d/b/a Five

Million Square Feet Companies sued Underwriters, their appraiser, and the umpire in state district court in Harris County, Texas on October 7, 2009.  Defendant Azad also sought temporary and permanent injunctive relief restraining the parties-defendant in that lawsuit from engaging in the appraisal process.  Subsequently, Chaucer and Defendants agreed to appoint new appraisers and a new umpire.  Defendant Azad dismissed the state court lawsuit after that agreement was reached.

25.     Despite interruption of the appraisal process, Chaucer's original independent appraiser submitted his report.  The report set forth his appraisal of damages for both replacement cost values and actual cash values of the damages to each property.  Chaucer caused to be paid and tendered to Defendants, by and through their attorneys, the sum of $263,582.39 which was calculated as the additional ACV of the losses based on such appraisal.

26.     Chaucer and Defendants are currently engaged in the second appraisal with regard to physical damage Defendants are claiming.  However, aside from the scope of the claimed property damage losses, there are coverage issues that can only be determined by the Court and which cannot be determined by appraisal.  For instance, during the appraisal process, the six properties were re-inspected.  Such property inspections reveal that necessary repairs were never made and that Defendants failed to protect all the properties from further damage, not just Trading Fair IV.  Further, Defendants have made claims for damage to property that is not covered by the Policy.  In addition, Defendants sold one of the properties which may effect or diminish coverage.

27.     Upon information and belief, Defendant Azad has diverted one or more of the insurance payment advances to satisfy Defendants' debts to lending or financial institutions.  For instance, although submitting proofs of loss for the full replacement cost value of the claimed damage, Defendants notified one of their mortgagees on Trading Fair IV that they never intended to reopen the business and that they intended "to pay off the debt with the insurance proceeds".

28.     Defendants have also filed a business interruption claim.  This claim, although subject to appraisal, is being reviewed by forensic accountants hired for the purpose of assisting Chaucer in calculating the business interruption loss.  Chaucer has authorized and paid $284,772.00 of the insured's business interruption claim.  Defendants are requesting payment of additional business income losses of over $700,000, but have not produced  all necessary documents to support their claims for analysis by Chaucer's forensic accountants.  Therefore, the business interruption claim cannot be completed.

## COUNT ONE

## BREACH OF CONTRACT

29.     Paragraphs 1 - 28 are incorporated herein as if fully set forth.

30.     The facts and circumstances set forth above have given rise to a controversy between Chaucer and Defendants as to the respective parties' duties and responsibilities under the Policy.  Specifically, Defendants have a duty to cooperate in providing necessary documents and information to Chaucer's independent adjusters and to participate in the appraisal process in good faith.

31.     The Policy provides under Section E.3 entitled Duties in the Event of Loss or Damage that the insured is to cooperate with the insurer in the investigation of the claim.  Chaucer, through its adjuster, made repeated requests for supporting documentation on both the building damages and business interruption claims.  Those requests were not always honored.  Both the adjustment and appraisal process on the property damage claim were stalled as a result.  Therefore, Defendants have breached and continue to breach conditions in the Policy requiring Defendants to cooperate in the investigation of the claim.

32.     Defendants breached and are breaching the contract and conditions contained in such contract by failing to provide necessary documents and information to substantiate Defendants'

business interruption claim.  Defendants' representatives have provided a number of documents relating to the business interruption claim, but their submissions are incomplete.  This has delayed the forensic accountants' examination and conclusion of the claim.  In addition, Defendants failed to provide information material to consideration of the business interruption claim such as information concerning their intentions on Trading Fair IV and the sale of Trading Fair II.  Such information materially affects, or could materially affect, the amounts payable under any business interruption coverage.  Defendants have thus breached their duties under the Policy.

33.    The Policy's Building and Personal Property Coverage Form and Business Income Coverage Form contain the following  appraisal provision:

```
E.    Loss Conditions

      2.    Appraisal

            If we and you disagree on the value of the property or
            the amount of loss, either may make written demand for
            an appraisal of the loss.  In this event, each party
            will select a competent and impartial appraiser.  The
            two appraisers will select an umpire.  If they cannot
            agree, either may request that selection be made by a
            judge of a court having jurisdiction.  The appraisers
            will state separately the value of the property and
            amount of loss.  If they fail to agree, they will submit
            their differences to the umpire.  A decision agreed to
            by any two will be binding.  Each party will:

      a.    Pay its chosen appraiser; and
      b.    Bear the other expenses of the appraisal and umpire
            equally.

            If there is an appraisal, we still retain our right to
            deny the claim.
```

(CP 00 10 04 02 and CP 00 32 04 02)

34.    The Policy's appraisal provisions provide that if the two appraisers cannot agree, they will submit their differences to an agreed upon umpire.  If the appraisers cannot agree on an umpire, then either side may request that the selection be made by a judge of a court having jurisdiction.

35.     If Defendants and Chaucer reach an impasse on the business interruption claim, once Defendants provide sufficient documents and information on such claim so that the adjustment process can be completed, Chaucer requests the Court to compel appraisal and, if necessary, appoint an umpire for the business interruption claim.

36.     Finally, Defendants have breached the Policy by not taking reasonable steps to protect the property from further damage and by neglecting to use all reasonable means to save and preserve the property from further damage at or after the time of the loss.  These breaches, as are the others alleged herein, are material.

37.     Defendants cannot abandon the property to their insurers and, through such action, force insurers to pay for subsequent damages due solely to Defendants' neglect and abandonment. This is particularly true when insureds, like Defendants, choose to pay less premiums in exchange for larger deductibles.  For instance, the applicable deductible for Trade Fair IV alone was over $300,000.  Other properties had even higher deductibles, although some were lower.  However, the total deductible exceeded $1.8 million.  Despite this, Chaucer advanced $1.636 million to Defendants.  Defendants should have, but did not, take all necessary steps to protect the properties. Instead of using this advance and in disregard of their deductible, upon information and belief, Defendants diverted funds paid and advanced by their insurers for other purposes or to retire indebtedness to lending and financial institutions.

38.     Such acts and practices and material breaches of the Policy and its conditions have proximately caused loss or damage to Plaintiff for which Plaintiff now sues.

## COUNT TWO

## <u>DECLARATORY JUDGMENT</u>

39.     Paragraphs 1 - 38 are incorporated herein as if fully set forth.

40.     Defendants have made claims for damages to which they are not entitled and have not considered Policy limitations and exclusions in calculating their claims.  Instead, Defendants have submitted repair estimates which, if accepted, would result in payment for damages not otherwise covered.  The facts and circumstances set forth in this Amended Complaint have given rise to a controversy between Chaucer and Defendants as to the extent of coverage under the Policy as well as the amount of damages payable.  Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, Chaucer seeks the following declarations from the Court.

41.     Chaucer seeks a declaration that there is no coverage or reduced coverage under the Policy for damage to Defendants' properties, now being claimed by Defendants, because Defendants failed to protect their properties from further damage after the loss.  The Policy provides that:

```
E.     Loss Conditions

       3.     Duties in the Event of Loss or Damage

              a.     You must see that the following are done in the
                     event of loss or damage to Covered Property:

                     (4)   Take all reasonable steps to protect the
                           Covered Property from further damage, and
                           keep a record of your expenses necessary to
                           protect    the    Covered    Property,    for
                           consideration   in   the   settlement   of   the
                           claim. This will not increase the Limit of
                           Insurance.   However,  we  will  not  pay  for
                           any   subsequent   loss   or   damage   resulting
                           from a cause of loss that is not a Covered
                           Cause of Loss.  Also, if feasible, set the
                           damaged   property   aside   and   in   the   best
                           possible order for examination.
```

The Policy further provides that:

CAUSES OF LOSS - SPECIAL FORM

B.   Exclusions

    2.   We will not pay for loss or damage caused by or resulting from any of the following:

        m.   Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

42.   Chaucer seeks a declaration that there is no coverage under the Policy for damages, now being claimed by Defendants, which is actually caused by or resulting from wear and tear or from rust or other corrosion, decay or latent defects.  The Policy provides that:

CAUSES OF LOSS - SPECIAL FORM

B.   Exclusions

    2.   We will not pay for loss or damage caused by or resulting from any of the following:

        d.   (1) Wear and tear;

        (2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

43.   Chaucer seeks a declaration that there is no coverage under the Policy for damages, now being claimed by Defendants, for exterior paint.  The Policy provides that:

AmRISC CAT COVERED PROPERTY ENDORSEMENT

PROPERTY NOT COVERED

1.   **We do not cover:**

    k.   Paint or waterproof material including stain, applied to the exterior of any building or structure;

44.   Chaucer seeks a declaration that there is no coverage under the Policy for damages to exterior signs that are not attached to any building covered by the Policy.  The Policy provides that:

```
AmRISC CAT COVERED PROPERTY ENDORSEMENT

PROPERTY NOT COVERED

1.    We do not cover:

      w.    Signs, radio or television antennas or
            aerials, satellite dishes (including lead
            in wiring, masts or towers and their
            supports), utility poles (including light
            fixtures), light poles, traffic lights and
            traffic signals. . . .
```

45.    Chaucer seeks further declarations that there is no coverage, or limited coverage as

the case may be, for damages, now being claimed by Defendants, for fungus and mold, mold

remediation, increased cost of construction, or for property that is in a state of disrepair.  For

instance, but without limitation, the Policy excludes, among other things:

```
LIMITATIONS ON FUNGUS, WET ROT, DRY ROT AND BACTERIA
AR 01 71 03 04

   A.    The following exclusion is added. With respect
         to the loss or damage addressed therein, this
         exclusion supersedes any other exclusion which
         addresses fungus.

   "Fungus", Wet Rot, Dry Rot And Bacteria

         We will not pay for loss or damage caused
         directly or indirectly by the presence,
         growth, proliferation, spread or any
         activity of "fungus", wet or dry rot, or
         bacteria. Such loss or damage is excluded
         regardless of any other cause or event that
         contributes concurrently or in any sequence
         to the loss.          * * *

ORDINANCE OR LAW COVERAGE
04/07

         The Insurer(s) shall not be liable for Ordinance
         or Law coverage, if provided by this policy,
         unless the loss to the insured building equals
         or exceed 50% of the Building's total
         Replacement Cost.

PROPERTY ABANDONED, CONDEMNED OR IN A STATE OF DISREPAIR
06 06

         If at the date of loss to property covered by
         this policy, the condition of the property prior
         to the loss is found to be either:
```

```
1.  abandoned, or
2.  condemned, or
3.  in a state of disrepair

then recovery under this policy for damage from
a covered peril is limited to the lesser of:

    1.  the cost to repair at Actual Cash value,
        or
    2.  the Actual Cash value of the property
        prior to the loss, or
    3.  $10,000.
```

46.     Chaucer seeks a declaration that there is no coverage for interior damages, now being claimed by Defendants, to any building or structure caused by or resulting from rain, whether driven by wind or not, unless the building or structure first sustains damage by a covered cause of loss through which the rain enters.

47.     Chaucer seeks a declaration that there is no coverage under the Policy for damages, now being claimed by Defendants, caused by or resulting from continuous or repeated seepage or leakage of water or the presence or condensation of humidity, moisture, or vapor that occurs over a period of 14 days or more in accordance with the following Policy provision:

```
We will not pay for loss or damage caused
by or resulting from continuous or repeated
seepage or leakage of water, or the
presence or condensation of humidity,
moisture or vapor, that occurs over a
period of 14 days or more.
```

48.     Chaucer seeks a declaration that there is no coverage under the Policy for damages, now being claimed by Defendants, which are actually caused by faulty, inadequate, or defective design, workmanship, repair, construction, renovation, remodeling, maintenance, or materials used in the repair, construction, renovation, or remodeling of the buildings pursuant to applicable Policy limitations such as:

```
3.  We will not pay for loss or damage caused by or
    resulting from any of the following 3.a. through
    3.c. But if any excluded cause of loss that is
    listed in 3.a. through 3.c. results in a Covered
```

```
                Cause of Loss, we will pay for the loss or damage
                caused by that Covered Cause of Loss.
                            * * *
                c.   Faulty, inadequate or defective:
                     (1)   Planning,    zoning,    development,
                           surveying, siting;
                     (2)   Design, specifications, workmanship,
                           repair, construction, renovation,
                           remodeling, grading, compaction;
                     (3)   Materials used in repair,
                           construction, renovation or remodeling;
                           or
                     (4)   Maintenance;
                     of part or all of any property on or off the
                     described premises.
```

49.     Chaucer seeks a declaration that there is no coverage under the Policy for damages

caused by pre-existing conditions in the buildings or structures in accordance with the following

Policy provision:

```
                <u>PRE-EXISTING DAMAGE PROVISIONS</u>
                AR PED 03 06

                It is understood and agreed that this policy
                shall exclude any loss or damage directly or
                indirectly caused by, resulting from or
                contributed to by any pre-existing building
                damage at the time of this Certificate's or this
                policy's inception. This exclusion shall be
                removed upon substantial completion of repair or
                reconstruction of the damaged building.
```

50.     Chaucer seeks a declaration that there is no coverage under the Policy for damages

caused by flood in the buildings or structures in accordance with the following Policy provision:

```
                CAUSES OF LOSS - SPECIAL FORM (CP1030)

                B.   EXCLUSIONS

                1.   We will not pay for loss or damage caused
                     directly or indirectly by any of the
                     following:
                            * * *
                     g.   Water
                          (1)   Flood, surface water, waves,
                                tides, tidal waves, overflow of
                                any body of water, or their
                                spray, all whether driven by
                                wind or not.
                          (2)   Mudslide or mudflow;
                          (3)   Water that backs up or
                                overflows from a sewer, drain
                                or sump; or
```

```
              (4)   Water under the ground surface
                    pressing  on,  or  flowing  or
                    seeping through;
                    (a)   Foundations,      walls,
                          floors    or    paved
                          surfaces;
                    (b)   Basements, whether paved
                          or not; or
                    (c)   Doors, windows or other
                          openings.
                          * * *
      COVERED CAUSES OF LOSS
      Special Perils, Excluding Flood and Earthquake
                          * * *
      2.    Coverage explicitly excludes all flooding,
            including  but  not  limited  to  flooding
            during windstorm events.
                          * * *
      10.   Warrant National Flood Insurance Program
            (NFIP) by  others  within  45  days  of
            inception any  location  within  5 miles to
            saltwater.
```

51.     Chaucer seeks a declaration that there is no duty to pay Defendants the RCV for any

loss being claimed under the Policy unless and until Defendants complete repairs and unless the

repairs are completed within the time period specified in the Policy.  In addition, Chaucer seeks a

declaration that there is no duty to pay Defendants at RCV for roofs except as follows:

```
      1.    Replacement Cost Valuation shall apply as regards
            to Real Property: Except;

      A.    Roof  coverings  to  be  Actual  Cash  value  if
            originally installed or last fully replaced prior
            to 1995.

      B.    Vacant buildings (or any building with occupancy
            less than 31%) to be Actual Cash Value
```

52.     Chaucer seeks a declaration from the Court that there is no duty under the Policy to

pay Defendants the RCV of the loss to buildings such as Trading Fair II which Defendants sold in

September 2009 "as is".

53.     These declarations are based upon information currently known to Plaintiff and are

not necessarily the only declarations which may be necessary as discovery proceeds and the case

moves towards trial.  There are also limitations on coverage for business interruption losses which may arise before conclusion of such claims.

## COUNT THREE

### ATTORNEY'S FEES

54.     Chaucer further respectfully requests that this Court award Chaucer its reasonable and necessary attorney's fees and costs of court incurred herein because of Defendants' breach of contract in failing to cooperate in the investigation of its claim and provide necessary documents and information.  Chaucer has made or will make a proper presentment of its attorney's fees claim. Chaucer makes no claim for that portion of its attorney's fees as may be attributable to its requested relief under the Declaratory Judgment Act.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Chaucer respectfully prays that Defendants be cited to appear and answer herein and, upon trial:

a.      That the Court determine and declare that Defendants have breached one or more conditions of the Policy as alleged in Count One and award damages proximately caused by such conduct along with other appropriate relief as may be necessary, such as specific performance;

b.      That the Court compel Defendants to provide all requested documents and information necessary to complete the adjustment process of the Defendants' business interruption claims;

c.      That the Court enter such rulings and declarations requested in Count Two and as may be necessary as shown by discovery;

d.      That the Court award Chaucer all pre-judgment and post-judgment interest as may be allowed by law;

e.      That the Court award Chaucer its reasonable and necessary attorney's fees as set forth herein;

f.      That the court award Chaucer its costs of court; and

g.      That the Court award Chaucer such other and further relief to which it may
        show itself to be justly entitled, whether at law or in equity.

                                        Respectfully submitted,


                                         /s Richard H. Gateley
                                        Richard H. Gateley
                                        State Bar No. 07752500
                                        Federal Bar No. 12634

                                        BRACKETT & ELLIS,
                                        A Professional Corporation
                                        100 Main Street
                                        Fort Worth, Texas  76102-3090
                                        (817) 338-1700
                                        Metro: (817) 429-9181
                                        (817) 870-2265 Facsimile

                                        ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 24, 2010, I electronically filed the foregoing document with the Clerk of Court for the U. S. District Court, Southern District of Texas, Houston Division, using the electronic case filing system of the Court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

William F. "Chip" Merlin
Merlin Law Group
777 S Harbour Island Blvd
Tampa, FL 33602

William F. Harmeyer
William F. Harmeyer & Associates, P.C.
475 Arena Tower One
7322 Southwest Freeway
Houston, TX 77074

    /s Richard H. Gateley          
Richard H. Gateley