IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHAUCER CORPORATE CAPITAL, | § | |
| NO. 2 LIMITED, | § | |
| | § | |
| *Plaintiff,* | § | |
| v. | § | CIVIL ACTION NO: 4:10-cv-00180 |
| | § | |
| HARDAM S. AZAD D/B/A | § | JURY TRIAL DEMAND |
| FIVE MILLION SQUARE FEET | § | |
| COMPANIES; HOUSTON SHOPPING | § | |
| CENTER MANAGERS, LP D/B/A | § | JUDGE EWING WERLEIN, JR. |
| COM REALTY AND SOUTH VILLAGE | § | |
| SHOPPING CENTER; CONTINENTAL | § | |
| BALLROOMS, INC.; TRADING FAIR IV, | § | |
| INC.; TRADING FAIR III, INC.; | § | |
| TRADING FAIR HOUSTON, INC.; | § | |
| THE TOMBALL CENTER, INC.; AND | § | |
| WEBSTER/MARINAGATE, INC. | § | |
| | § | |
| *Defendants.* | § | |

**I.**
**DEFENDANTS' ORIGINAL ANSWER TO**
**PLAINTIFF CHAUCER CORPORATE CAPITAL NO. 2 LIMITED**
**AMENDED COMPLAINT (DOC. # 4) (Page 2);**

**and**

**II.**
**DEFENDANTS' COUNTERCLAIM AND THIRD-PARTY COMPLAINT (Page 13)**

**I.**
**DEFENDANTS' ORIGINAL ANSWER TO**
**PLAINTIFF CHAUCER CORPORATE CAPITAL NO. 2 LIMITED**
**AMENDED COMPLAINT (DOC. # 4)**

Defendants, HARDAM S. AZAD D/B/A FIVE MILLION SQUARE FEET COMPANIES ("Five Million Square Feet"), HOUSTON SHOPPING CENTER MANAGERS, LP D/B/A COM REALTY AND SOUTH VILLAGE SHOPPING CENTER, CONTINENTAL BALLROOMS, INC., TRADING FAIR IV, INC, TRADING FAIR III, INC., TRADING FAIR HOUSTON, INC., THE TOMBALL CENTER, INC., AND WEBSTER/MARINAGATE, INC., file this their Answer to Plaintiff CHAUCER CORPORATE CAPITAL NO. 2 LIMITED's ("Chaucer") Amended Complaint (Doc. # 4), and would show the Court as follows:

**ANSWER**

1.   Defendants lack information sufficient to form a belief about the truth of the allegations of paragraph No. 1 of the Amended Complaint, and deny them on this basis.

2.   Defendants admit the allegations of paragraph No. 2 of the Amended Complaint.

3.   Defendants deny the allegations of paragraph No. 3 of the Amended Complaint only to the extent that it is alleged that the two entities identified therein are currently in existence, but otherwise admit all other allegations.

4.   Defendants admit the allegations of paragraph No. 4 of the Amended Complaint.

5.   Defendants admit the allegations of paragraph No. 5 of the Amended Complaint.

6.   Defendants admit the allegations of paragraph No. 6 of the Amended Complaint.

7.   Defendants admit the allegations of paragraph No. 7 of the Amended Complaint.

8.   Defendants admit the allegations of paragraph No. 8 of the Amended Complaint.

9.   Defendants admit the allegations of paragraph No. 9 of the Amended Complaint.

<u>**JURISDICTION AND VENUE**</u>

10. Defendants deny the diversity jurisdiction allegations of paragraph No. 10 of the Amended Complaint, but admit that the defendants are citizens of Texas and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

11. Subject to the Defendants' jurisdiction denial, Defendants otherwise admit the allegations of paragraph No. 11 of the Amended Complaint.

<u>**FACTUAL BACKGROUND**</u>

12. Defendants deny the allegations of paragraph No. 12 of the Amended Complaint, except as it is or may by alleged as follows: Certain Underwriters at Lloyd's, London ("Lloyd's") caused to be issued a policy of insurance to Five Million Square Feet Companies, the named Insured under Certificate No. AMR-21528, effective September 18, 2007, to September 18, 2008, (the "Policy") insuring six different properties in the Houston area, owned, respectively, by Continental Ballrooms, Inc., Trading Fair IV, Inc., Trading Fair III, Inc., Trading Fair Houston, Inc., The Tomball Center, Inc., and Webster/Marina Gate, Inc., with combined total insurable value Policy limits in excess of $45 million.

13. Defendants deny the allegations of paragraph No. 13 of the Amended Complaint, except as it is or may be alleged as follows: on September 13, 2008, Hurricane Ike struck the Houston area. Thereafter, the named Insured, Five Million Square Feet, sent Lloyd's a property loss notice for damage to the six properties insured by the Policy as a result of Hurricane Ike. Lloyd's retained adjusters and the Insured retained Balance Loss Consultants as public adjusters. Lloyd's caused to be issued advance payments to Five Million Square Feet in the amount of $661,618 (plus $338,382 in drafts jointly to Five Million Square Feet dated November 20, 2008, and Village Contractors). These checks for $661,618 were received by the Insured on November

24, 2008, and were advance payments to Five Million Square Feet for all coverages under the Policy for all six of the properties.  By checks dated December 31, 2008, Lloyd's caused to be issued an additional payment to Five Million Square Feet in the amount of $636,874.34, and received by the Insured on January 7, 2009, to be applied  towards the Policy coverages on all six properties.

14. Defendants deny the allegations of paragraph No. 14 of the Complaint, except to the extent it is or may be alleged as follows: one of the properties that was damaged was 630 W. Little York, Houston, an indoor flea market property owned by Trading Fair IV, Inc., ("Trading Fair IV").  Due to the damage to Trading Fair IV, Lloyd's adjusters determined that certain emergency services and temporary repair work needed to be performed.  Lloyd's adjusters brought a contractor known to them but unknown to the Defendants to Trading Fair IV, and based upon the recommendation and authorization of the Lloyd's adjusters, the manager of the facility signed a Work Authorization for Village Contractors, Inc. ("Village Contractors").  The scope of work and price for temporary roof repairs and interior demolition and  dry-out were, negligently or fraudulently, agreed solely between Lloyd's adjusters and Village Contractors without the involvement of the Defendants.  Village Contractors proposed a shrink wrap method of temporary repair as the best alternative, which was rejected by the Lloyd's adjusters. The agreed scope of work concerned temporary roof repairs for the sum of $29,500, and interior demolition and dry-out in the sum of $308,882.  However, the inadequate repair scope agreed upon between Lloyd's adjusters and Village Contractors did not hold out the first rain, inundated the building within two days of the completion of the temporary repairs and dry-out, and totally made worthless the interior dry-out investment. Lloyd's adjusters were advised of the failure of the temporary roof repairs.   Thereafter, Lloyd's adjusters first approved the alternative shrink

wrap method of securing the roof, but then reneged after a contract was let for the shrink wrapping, yet warned that the Insured would be required to proceed to mitigate its damages.  On November 20, 2008, Lloyd's issued joint checks to Five Million Square Feet and Village Contractors in the invoiced amount of $338,382.  Because of the total failure of those repairs and the refusal of the Lloyd's adjusters to approve the shrink wrap (thereby leaving the Insured and/or Trading Fair IV with the obligation to be financially responsible for a shrink wrap and dry out to mitigate damages) Five Million Square Feet returned the checks to Lloyd's.

15. Defendants deny the allegations of paragraph No. 15 of the Amended Complaint except it is or may be alleged as follows: The manager for the Trading Fair IV facility signed a Work Authorization permitting Village Contractors to perform emergency repairs to the property.  The Lloyd's adjuster and Village Contractors agreed to an inadequate roof repair scope for a cost of $29,500, and an interior dehumidification and demolition scope for a total emergency repair scope of $338,382.   Village Contractors hired Mobile Dry Force, LLC, to perform dehumidification and drying services.  The inadequate roof repair scope failed to keep out the first rain after completion of the dehumidification, causing extensive water intrusion into the interior of the building and rendering totally worthless the dehumidification investment.

16. Defendants deny the allegations of paragraph No. 16 of the Amended Complaint except as it is or may be alleged as follows:  Sharon Wagner, the manager for Trading Fair IV, signed a Work Authorization with Village Contractors on September 23, 2008, just 10 days after Hurricane Ike at the behest of the Lloyd's adjusters.  Village Contractors completed its work on or before October 6, 2008.  Village Contractors, through Mobile Dry Force, LLC, and the manager of Trading Fair IV inspected the building on October 6, 2008, and Mobile Dry Force walked with and showed the manager a hand-held electronic testing device to show moisture

level readings at walking height.  The manager signed an acknowledgement of same on that same date and received a copy of the Mobile Dry Force report.

17. Defendants deny the allegations of paragraph No. 17 of the Amended Complaint except as it is or may be alleged as follows:  at the time of their initial inspections, the Lloyd's adjusters advised that the cooling towers for Trading Fair IV needed to be replaced.  The Lloyd's adjusters took steps to locate replacement cooling towers.  On or about October 31, 2008, the Lloyd's adjusters obtained a roof replacement bid for approximately $1 million, but with the Village Contractors 20% overhead and profit, the bid exceeded $1.2 million.  Additionally, the Lloyd's adjusters disagreed with the bid's lightweight concrete unit pricing and the bid failed to identify the scope for lightweight concrete replacement, which was grossly underestimated in the bid. Additionally, by that time, the Village Contractors' roof repairs proved to be totally inadequate, and had caused additional water intrusion through subsequent rains, and the Trading Fair IV flea market tenants were in the process of vacating and relocating to a new flea market in an attempt to save their Christmas retail season. By this time, the Insured had received no advances from Lloyd's towards any property damage or business interruption claim; the Trading Fair IV tenants were relocating in mass thereby depriving Trading Fair IV of any additional business income; Trading Fair IV continued to be responsible for mortgage and other expenses despite the loss of the business; and the Insured was advised by the Lloyd's adjusters that they would be responsible to mitigate further damages, but the Lloyd's adjusters refused to authorize insurance monies for an emergency shrink wrap to secure the roof or to authorize an additional dry out of the interior.  Lloyd's adjusters developed significant animosity towards the Insured and its public adjusters due to the complaints by the Insured and public adjusters about the inadequacy of the Village Contractors' roof repairs; and the Lloyd's adjusters refused continued cooperation in a

professional manner with the Insured and its public adjusters.  As a result, the property suffered further damages for which the Insured has made claims.

18. There is no paragraph No. 18 between the first paragraph Nos. 17 and 19 in the Amended Complaint.

19. Defendants deny the allegations of paragraph No. 19 of the Amended Complaint except as it is or may be alleged as follows: the Lloyd's adjusters' conduct followed the same pattern on most, if not all, of the remaining properties.  The Lloyd's adjusters failed to use even reasonable efforts to estimate the damage caused by Hurricane Ike. Although advances were made by Lloyd's, they were late and inadequate. The Lloyd's adjusters failed and refused to recognize the extent of damage or scope of repair necessary for the properties and payable under the insurance contract.

18. [1] Defendants deny the allegations of their paragraph No. 18 of the Amended Complaint except as it is or may be alleged as follows: during the course of the adjustment process, the Lloyd's adjusters continued to disagree with the Insured's public adjusters regarding damage causation and scope of reasonable and necessary repairs.  The Lloyd's adjusters and the Insured's public adjusters, respectively, hired engineers to inspect the roofs and report on causation.  The Insured's public adjusters used their best efforts to cooperate with the Lloyd's adjusters and their engineers but met continued resistance and animosity from the Lloyd's adjusters.

19. Defendants deny the allegations of paragraph No. 19 of the Amended Complaint except as it is or may be alleged as follows: the Lloyd's adjusters improperly determined that there was little or no damages from Hurricane Ike either to the roofs or to the interior spaces of some properties.  The Insured's public adjusters, together with the Insured's inspectors, determined

---

[1] Plaintiff's Amended Complaint here begins renumbering its paragraphs starting with paragraph No. 18.

that significant roof replacement and repair, together with significant interior damage, had been caused to the properties by Hurricane Ike.  The Insured's public adjusters continued to provide information and cost estimates to the Lloyd's adjusters.

20. Defendants deny the allegations of paragraph No. 20 of the Amended Complaint except as it is or may be alleged as follows:  in accordance with the policy provisions, and by letter dated January 22, 2009, the Insured submitted a Proof of Loss for $11,254,013.81 which, after applicable deductibles, resulted in a claim of $9,396,748.  The Proof of Loss was subsequently rejected by Lloyd's, and thereafter Lloyd's and the Insured appointed independent appraisers to determine the RCV and ACV of the claimed loss in accordance with the appraisal provisions of the policy.

21. Defendants deny the allegations of paragraph No. 21 of the Amended Complaint except as it is or may be alleged as follows:  the Insured chose and appointed its appraiser.  Lloyd's did likewise.  The two appraisers, in accordance with the terms of the policy, selected and agreed to an umpire. The chosen appraisers met and began their inspections.  However, no final agreements were ever reached between the appraisers and the umpire.

22. Defendants deny the allegations of paragraph No. 22 of the Amended Complaint except as it is or may be alleged as follows: out of the $1 million advance payment to the Insured in November 2008, five of the checks were made jointly payable to Five Million Square Feet and Village Contractors for the invoiced amount of $338,382 for the failed emergency repair work. Five Million Square Feet never cashed those checks, never issued payment to Village Contractors or Mobile Dry Force, and returned the checks to Lloyd's because the services were improperly performed and essentially of no use or value to Trading Fair IV.

23. Defendants deny the allegations of paragraph No. 23 of the Amended Complaint except

as it is or may be alleged as follows: Village Contractors sued various of the Defendants and other related and unrelated entities for payment of the $338,382 invoice.  On August 21, 2009, Chaucer filed an interpleader action in this Court, Cause No. 4:09-cv-02701, to deposit the $338,382 in the registry of the Court.

24. Defendants admit the allegations of paragraph No. 24 of the Amended Complaint.

25. Defendants admit that Lloyd's paid to Defendants an additional sum of $263,582.39. Defendants have insufficient information to admit or deny the remainder of the allegation of paragraph No. 25 of the Amended Complaint and therefore deny same.

26. Defendants deny the allegations of paragraph No. 26 of the Amended Complaint except as it is or may be alleged as follows:  Lloyd's and the Insured are currently engaged in the second appraisal with regard to damages Defendants are claiming.  Lloyd's asserts that there are coverage issues that can only be determined by the Court. During the appraisal process, the six properties were re-inspected.  Trading Fair II was forced to sell its property to mitigate damages to avoid a mortgage default and foreclosure, and Lloyd's may take the position that the sale affected or diminished coverage.

27. Defendants deny the allegations of paragraph No. 27 of the Amended Complaint except as it is or may be alleged as follows:  as of January 7, 2009, and out of the $45 million total insurable value policy, Lloyd's had only issued advances for property damage and business interruption income for $1,298,492 on all six properties; had $338,382 in advances trapped as payable to Village Contractors; had agreed to a wholly inadequate means and scope of temporary repair on Trading Fair IV rendering totally worthless the interior dry out of the building; failed to authorize additional temporary roof repairs or additional dry out insurance monies for Trading Fair IV; presented a $1.2 million roof bid through Village Contractors and Allied without

identifying an adequate scope of lightweight concrete repair or an approval on lightweight concrete unit pricing; and had taken the position that no additional funds were due to the Insured under the terms of the policy.  Nevertheless, the Defendants continue to mitigate damages by performing temporary repairs on the buildings and making mortgage and other necessary business expense payments in an attempt to save the properties from additional damage and foreclosures.

28. Defendants deny the allegations of paragraph No. 28 of the Amended Complaint except as it is or may be alleged as follows:  the Insured has also filed a business interruption claim on behalf of the Defendants.  This claim is also in the appraisal process.  Lloyd's has paid, and on August 4, 2009, the Insured received $284,772 of the business interruption claim.  The Defendants believe they have provided all necessary documents to support their claims.

## COUNT I – BREACH OF CONTRACT

29. Paragraphs 1-28 are incorporated herein as if fully set forth.

30. Defendants admit the allegations of paragraph No. 30 of the Amended Complaint, but only to the extent stated in the Policy.

31. Defendants deny the allegations of paragraph No. 31 of the Amended Complaint except to the extent that the Policy, Section E.3, (Building and Personal Property Coverage Form, page 9 of 14), is entitled "Duties in the Event of Loss or Damage" and to the extent stated therein, which is admitted.

32. Defendants deny the allegations of paragraph No. 32 of the Amended Complaint except to the extent that Defendants have provided a number of documents relating to the business interruption claim to Lloyd's, which is admitted.

33. Defendants admit the allegations of paragraph No. 33 of the Amended Complaint.

34. Defendants admit the allegations of paragraph No. 34 of the Amended Complaint.

35. No response is necessary to paragraph No. 35 of the Amended Complaint.  If further response is necessary, Defendants admit that Plaintiff has pleaded a conditional request for appointment of an umpire for business interruption claim.

36. Defendants deny the allegations of paragraph No. 36 of the Amended Complaint.

37. Defendants deny the allegations of paragraph No. 37 of the Amended Complaint except that Defendants admit that the applicable Trading Fair IV deductible was over $300,000, the total deductibles exceeded $1.8 million, and Lloyd's advanced $1.636 million by January 7, 2009, but $338,382 of those monies were trapped by joint checks payable to Village Contractors for alleged temporary roof repairs that did not hold out the first rain and caused further and extensive damage to the Trading Fair IV property.

38. Defendants deny the allegations of paragraph No. 38 of the Amended Complaint except to the extent that Plaintiff has filed suit, which is admitted.

### <u>COUNT II – DECLARATORY JUDGMENT</u>

39. Paragraphs 1-38 are incorporated herein as if fully set forth.

40. Defendants deny the allegations of paragraph No. 40 of the Amended Complaint except to the extent that it is alleged that Defendants have made claims for damages, Defendants have submitted repair estimates, and that Plaintiff has brought a declaratory judgment action herein, which is admitted.

41. Defendants admit the allegations of paragraph No. 41 of the Amended Complaint except where it is alleged that Defendants failed to protect their properties from further damage after the loss, which is denied.

42. No response is necessary to paragraph No. 42 of the Amended Complaint. If further

response be necessary, Defendants admit that Chaucer seeks a declaration as pleaded.

43. No response is necessary to paragraph No. 43 of the Amended Complaint. If further response be necessary, Defendants admit that Chaucer seeks a declaration as pleaded.

44. No response is necessary to paragraph No. 44 of the Amended Complaint. If further response be necessary, Defendants admit that Chaucer seeks a declaration as pleaded.

45. No response is necessary to paragraph No. 45 of the Amended Complaint. If further response be necessary, Defendants admit that Chaucer seeks a declaration as pleaded.

46. No response is necessary to paragraph No. 46 of the Amended Complaint. If further response be necessary, Defendants admit that Chaucer seeks a declaration as pleaded.

47. No response is necessary to paragraph No. 47 of the Amended Complaint. If further response be necessary, Defendants admit that Chaucer seeks a declaration as pleaded.

48. No response is necessary to paragraph No. 48 of the Amended Complaint. If further response be necessary, Defendants admit that Chaucer seeks a declaration as pleaded.

49. No response is necessary to paragraph No. 49 of the Amended Complaint. If further response be necessary, Defendants admit that Chaucer seeks a declaration as pleaded.

50. No response is necessary to paragraph No. 50 of the Amended Complaint.  If further response be necessary, Defendants admit that Chaucer seeks a declaration as pleaded.

51. No response is necessary to paragraph No. 51 of the Amended Complaint. If further response be necessary, Defendants admit that Chaucer seeks a declaration as pleaded.

52. No response is necessary to paragraph No. 52 of the Amended Complaint. If further response be necessary, Defendants admit that Chaucer seeks a declaration as pleaded.

53. Defendants admit that the policy provides for limitations on coverage for business interruption losses. No further response is necessary to paragraph No. 53 of the Amended

Complaint.

<u>COUNT III – ATTORNEY'S FEES</u>

54. Defendants admit that Plaintiff is requesting attorney's fees and costs of court, but deny

any breach of contract by the Defendants and deny that Chaucer is entitled to attorney's fees as

alleged in paragraph No. 54 of the Amended Complaint.


**II.**
**DEFENDANTS' COUNTERCLAIM AND THIRD-PARTY COMPLAINT**

HARDAM S. AZAD d/b/a FIVE MILLION SQUARE FEET COMPANIES ("Insured");

TRADING FAIR HOUSTON, INC. ("TF2");  TRADING FAIR III, INC. ("TF3"); TRADING

FAIR IV, INC.("TF4"); CONTINENTAL BALLROOMS, INC. ("Houston's Ballrooms"); THE

TOMBALL CENTER, INC. ("Tomball Shopping Center"); and WEBSTER/MARINAGATE,

INC.("Marina Gate") (collectively "Five Million Square Feet"), for causes of action against

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO CERTIFICATE

NO. AMR-21528 ("Lloyd's"); CHAUCER CORPORATE CAPITAL, NO. 2 LIMITED

("Chaucer"); CRAMER, JOHNSON, WIGGINS & ASSOCIATES, INC. ("CJW"); and E.G.P.

& ASSOCIATES, INC. ("EGP"), state to the Court and jury the following:

**I.**
**PARTIES**

1.      Third-Party Plaintiff AZAD is an individual resident of Harris County, Texas,

d/b/a Five Million Square Feet Companies in Harris County, Texas.

2.      Third-Party Plaintiff TF2 is a Texas corporation which owned property and

operated a business in Harris County, Texas.

3.      Third-Party Plaintiff TF3 is a Texas corporation owning property in Harris

County, Texas.

4.      Third-Party Plaintiff TF4 is a Texas corporation owning property and which operated a business in Harris County, Texas.

5.      Third-Party Plaintiff Houston's Ballrooms is a Texas corporation owning property and operating a business in Harris County, Texas.

6.      Third-Party Plaintiff Tomball Shopping Center is a Texas corporation which owned property and operated a business in Harris County, Texas.

7.      Third-Party Plaintiff Marina Gate is a Texas corporation owning property and operating a business in Harris County, Texas.

8.      Third-Party Defendant Lloyd's is a syndicate of insurance underwriters which does business in the international insurance market place known as the Society of Lloyds of which Counter-Defendant, Chaucer, alleges it is a  lead underwriter.  Lloyd's is listed with the Texas Department of Insurance as an eligible surplus line alien insurance company which may be served with process by serving **Mike Gleeson**, **the Texas Insurance Commissioner** (1) **personally** by a disinterested person who is at least 18 years of age leaving 2 copies of the process at the office of the Department, **at 333 Guadalupe, Austin, Texas 78701**, during regular business hours with (A) the Commissioner; or (B) an appointee of the Commissioner authorized to receive process; or (2) **by certified or registered mail**, pursuant to Tex. Ins. Code §§ 804.103(c) and 804.201(a) and (b).  Service on the Commissioner acting as agent for service of process is service on Lloyd's pursuant to Tex. Ins. Code § 804.202.  Pursuant to Tex. Ins. Code § 804.203(a)(1), the Commissioner is requested to immediately send by registered or certified mail, return receipt requested, one copy of the process served on the Commissioner as follows:

**CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO**
**CERTIFICATE NO. AMR-21528**
**c/o George C. Lock, Esq.**
**Mendes & Mount, LLP**
**750 7th Avenue**
**New York, New York, 10019**

9.      Third-Party Defendant **CRAMER, JOHNSON WIGGINS & ASSOCIATES, INC.** is a Florida corporation authorized to transact business in Texas and engaged in the business of insurance in Texas, and may be served with process through its registered agent, **John Hinz, at 7910 Fall River Court, Sugar Land, Texas 77479.**

10.     Third-Party Defendant **E.G.P. & ASSOCIATES, INC.** is a Georgia corporation authorized to transact business in Texas and engaged in the business of insurance in Texas, and may be served with process through its registered agent, **C T Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201-4234**.

11.     The Clerk is requested to issue Summons to CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO CERTIFICATE NO. AMR-21528; CRAMER, JOHNSON WIGGINS & ASSOCIATES, INC.; and E.G.P. & ASSOCIATES, INC.

## II.
### FACTUAL BACKGROUND

12.     On or about September 13, 2008, Five Million Square Feet sustained catastrophic damage to its buildings and contents as a result of Hurricane Ike.  At that time, Five Million Square Feet was insured by a policy of insurance provided by Lloyd's, bearing certificate number AMR-21528, that insured Five Million Square Feet for loss by windstorm (the "Policy"), and was in full force and effect on the date of Hurricane Ike. The Policy provided windstorm coverage for the properties insured by Five Million Square Feet and located in Houston, Harris County, Texas.   Five Million Square Feet sustained substantial damage to its buildings, contents

and businesses as a result of windstorm, and substantial loss as a result of interrupted business operations.

13.     Five Million Square Feet has submitted claims in accordance with the policy provisions to Lloyd's, and has consistently attempted to obtain full and complete payment for covered losses pursuant to Lloyd's contractual obligations.

14.     Lloyd's appointed a third party insurance adjusting firm, CJW, to act as its agent and representative for purposes of adjusting the insurance claim.   The individual at CJW personally adjusting the claim is Jeffrey C. Higgins ("Higgins").

15.     CJW retained EGP to assist it and Lloyd's in adjusting the insurance claim.   The individual at EGP assisting in adjusting the claim is David Wayne Beard ("Beard").

16.     Five Million Square Feet also retained professional estimators and adjusters, Balance Loss Consultants, to help evaluate and determine the amount of the claims Five Million Square Feet was submitting to Defendant Lloyd's.

17.     Five Million Square Feet has cooperated with requests made by Lloyd's and has displayed, at reasonable times, all of its relevant records, documents, buildings and contents that are the subject of this catastrophic loss. Lloyd's has persisted in delay or denial to pay the full amounts due for Five Million Square Feet's claims, even though a person of ordinary prudence and care would have done otherwise.

18.     Significant animosity was demonstrated by Higgins toward the adjusters of Balance Loss Consultants.   Higgins refused to orally communicate with Balance Loss Consultants, and refused face to face adjustment of the Claims.

19.     Further, Higgins and Beard negligently, intentionally, or fraudulently established a wholly inadequate scope of work and a wholly inadequate amount of policy proceeds to be

allocated for the temporary roof repairs of one of Plaintiffs' insured properties, known as Trading Fair IV ("TF4"), which resulted in:

> (1) a total failure of the roof repair upon the first rain;
>
> (2) a total loss of the $300,000 interior work and dry out;
>
> (3) a total loss of the TF4 flea market business;
>
> (4) eventually, a total loss of the TF4 building;
>
> (5) the placements of liens upon the TF4 property; and
>
> (6) litigation with the repair contractor (which was brought by CJW and Higgins to the job site, and upon which CJW and Higgins imposed upon or agreed to the inadequate temporary roof repair scope of work and costs.)

20.    Subsequently, Higgins instructed Five Million Square Feet that it had an obligation to mitigate further damages at the TF4 building; agreed to a shrink wrap of the roof (causing Five Million Square Feet to employ a contractor); and then withdrew consent and refused to advance policy proceeds for the shrink wrap which resulted in (1) the placement of additional liens on the TF4 building; and (2) additional litigation with that repair contractor.

21.    As a result of the animosity demonstrated by Higgins, Five Million Square Feet and Lloyd's were not able to agree upon the amount of benefits owed to Five Million Square Feet under the subject policy.

22.    Thereafter, Five Million Square Feet invoked the appraisal process set forth in the insurance policy for the property damage claims.  In addition to property damages, Five Million Square Feet also has pending claims for business interruption, loss of business income, and extra expense under the Policy, which also have been placed into appraisal for resolution. However, largely due to the fault of Lloyd's and CJW, to this day appraisals have not been completed which has caused Five Million Square Feet's injury and damages.

23.    TF4 was and continues to be completely shut down due to hurricane damage. TF4 continues to be in imminent danger of being lost to foreclosure, or sold at a great loss, due to the inability of the Plaintiff to reopen or obtain refinancing as a result of unrepaired and unremedied Hurricane Ike damage.

24.    TF2 was and continued to be completely shut down due to Hurricane Ike damage. It had to be sold at essentially a "fire sale" price to save it from foreclosure and the owners from ruined credit.

25.    TF3 is currently vacant.  Due to the unrepaired and unremedied Hurricane Ike damage the Plaintiff has been unable to repair the property and attract tenants in its current condition.  Nevertheless, expenses continue to accrue.

26.    Marina Gate is only partially occupied due to unrepaired and unremedied Hurricane Ike damage.  The Plaintiff is unable to secure new tenants or renew leases in the property's current condition.

27.    Tomball Shopping Center was only partially occupied due to unrepaired and unremedied Hurricane Ike damage.  The Plaintiff was unable to secure new tenants, renew leases, or secure refinancing resulting in a foreclosure of the property.

28.    Houston's Ballrooms continues to be Hurricane Ike damaged and the Plaintiff has been unable to fully utilize the property for its intended purposes.

29.    Despite some, but inadequate, insurance advances, the negative cash flow has been funded by shareholder cash calls.  Five Million Square Feet has a good faith belief that the Defendants are fully aware of these financial hardships and have delayed the adjustment and appraisal process to leverage a lower and unfair insurance claim settlement.

30.     Defendant Lloyd's, (and CJW and EGP, as the adjusters and agents of defendant Lloyd's), had and have an obligation of good faith and fair dealing to Five Million Square Feet to promptly and fully investigate the losses and claims of Five Million Square Feet in such a manner to ensure that Five Million Square Feet receives the full amount of benefits due and owing under the Policy. Lloyd's, CJW and EGP have the following obligations of good faith which Five Million Square Feet believes Lloyd's, CJW and EGP have adopted and assumed, or are obligated to uphold under Texas law:

a)      To honestly investigate and evaluate the facts and amount of loss   pertaining   to insurance claims looking for the true facts in a honest manner in order to obtain the fullest payment of benefits to its policyholder  as quickly as possible;

b)      To properly investigate coverage and promptly evaluate the loss and damage following receipt of the notice of the loss, and to fully,  and at the insurer's expense, investigate and evaluate all loss and damage following receipt of  the notice of loss;

c)      To hire qualified and properly motivated claims managers, adjusters, appraisers, investigators, claims personnel and attorneys to perform their duties and work in an honest and prompt manner, in compliance with all obligations and  duties consistent with those listed herein, with the understanding of "good faith," and to work for the benefit of the insured, Five Million Square Feet, rather than the financial interest of Lloyd's, and rather than to lower claim payments or wrongfully deny benefits;

d)      To promptly pay all undisputed amounts and benefits;

e)      Ensure that Five Million Square Feet shall receive honest, full and prompt disclosure of the status of the claim investigation and evaluation; and

f)      To not use the adjusting and appraisal process as a resolution process that is designed to   lower claim payments and benefits, but to ensure that the policyholder has a full, timely and fair adjustment of the Claim.

## III.
### CAUSATION

31.     The conduct described above was a producing, proximate and direct cause of actual damages to Five Million Square Feet.  These damages include, but are not limited to, the full benefits payable under the insurance policy, together with all out-of-pocket expenses incurred by Five Million Square Feet. Five Million Square Feet seeks prejudgment and post judgment interest at the highest lawful rate.  The amount of actual damages which should be awarded exceeds the minimum jurisdictional limits of this Court.

32.     Five Million Square Feet will show that Lloyd's, acting through its agents, servants, representatives and employees, including CJW and EGP, has failed to properly investigate, evaluate and adjust Five Million Square Feet's claim for benefits in good faith, and has failed to deal fairly. Lloyd's has failed and/or refused to evaluate the information and surrounding facts regarding Five Million Square Feet's covered claim, choosing instead to hide behind the palpably incorrect assumptions and conclusions of its agents, employees and consultants.  Lloyd's has further failed and/or refused, and continues to fail and/or refuse to pay, covered claims on a timely basis as required by the insurance contract and as required by the Texas Insurance Code. Instead, Lloyd's has wrongfully delayed and/or denied claims when liability for coverage under the Policy was reasonably clear.  Lloyd's has attempted to wrongly utilize the adjustment and appraisal process as a way to thwart and delay payment to Five Million Square Feet and to shirk its responsibilities under the Policy and under the Texas Insurance Code.

**IV.**
**CAUSES OF ACTION**

**A. COUNT ONE: BREACH OF CONTRACT (against all Defendants).**

33.     The Policy is a valid, binding and enforceable contract between Five Million Square Feet and Lloyd's.  Lloyd's breached the contract by failing or refusing to perform its obligations under the terms of the Policy and under Texas law.  Lloyd's breaches proximately caused Plaintiffs' injuries and damages for which Five Million Square Feet requests judgment. All conditions precedent required under the Policy have been performed, excused, waived or otherwise satisfied by Plaintiff(s).

34.     Defendants CJW and EGP have or had valid, binding and enforceable contracts with each other and with Lloyds under which Five Million Square Feet was a third-party creditor beneficiary under Texas law.  CJW and EGP breached their contracts by failing and refusing to perform their obligations under the terms of those contracts and under Texas law.  Defendants CJW's and EGP's breaches proximately caused Plaintiffs' injuries and damages for which Five Million Square Feet requests judgment.  All conditions precedent required under those contracts have been performed, excused, waived or otherwise satisfied.

**B. COUNT TWO: UNFAIR SETTLEMENT PRACTICES (against all Defendants)**

35.     Unfair settlement practices in violation of TEX. INS. CODE §541.060(a):

**Defendant Lloyd's**

36.     Lloyd's engaged in unfair settlement practices by:

    a)  Misrepresenting to Plaintiff(s) material facts or policy provisions relating to the coverage at issue;

    b)  Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the Claim, even though Lloyd's liability under the Policy was reasonably clear;

    c)  Failing to promptly provide Plaintiff(s) with reasonable explanations of the basis in the Policy, in relation to the facts or applicable law, for Lloyd's denials of the Claim or offers of a compromise settlement of the Claim;

    d)  Failing within a reasonable time to affirm or deny coverage of the Claim to Plaintiff(s) or to submit reservations of right to Plaintiff(s);

    e)  Refusing to pay Plaintiffs' Claim without conducting a reasonable investigation with respect to the Claim;

    f)  Failing to provide sufficient insurance advances and temporary repair scope of work to mitigate Plaintiff's damages.

37.    Each of the foregoing unfair settlement practices was committed knowingly by Lloyd's and was a producing cause of Plaintiffs' injuries and damages.

**Defendant CJW and Defendant EGP.**

38.    CJW and EGP were adjusters assigned by Defendant Lloyd's to adjust the Claim. EGP was a subcontractor, representative and/or agent of CJW and was acting in furtherance of the business of CJW at all time material while adjusting the Claim.  Accordingly, CJW is liable for the wrongful conduct of EGP.

39.    CJW and EGP were charged with investigating the Claim and communicating with the Insured about Policy terms.  Insurance adjusters are "persons engaged in the business of insurance" under the Texas Insurance Code § 541.001, *et seq*., and are individually liable for their individual violations of the Texas Insurance Code. *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482 (Tex. 1998).

40.    CJW and EGP were tasked with the responsibility of conducting a thorough and reasonable investigation of Plaintiffs' Claim, including fully quantifying: (1) the damage to the structures of Plaintiffs' businesses; (2) reasonable estimates, advances and temporary repair scope of work to mitigate Plaintiffs' damages; (3) Plaintiffs' businesses personal property losses; and (4) Plaintiffs' business income losses.

41.     Defendant CJW and Defendant EGP failed to fully quantify Plaintiffs' damages, thus demonstrating that they did not conduct a thorough investigation of the Claim.  These Defendants failed to fairly evaluate and adjust Plaintiffs' Claim as they are obligated to do under the terms of the Policy and Texas law.  By failing to properly investigate the Claim, and by undervaluing the Claim, these Defendants engaged in unfair settlement practices by misrepresenting material facts to Plaintiff(s) – the true nature and extent of temporary repairs and advances, and the true value of Plaintiffs' covered loss.  CJW and EGP also failed to provide Plaintiff(s) a reasonable explanation as to why Lloyd's was not compensating Plaintiff(s) for the full value of Plaintiffs' required temporary repairs and covered losses.

42.     In summary CJW and EGP individually engaged in unfair settlement practices by:

a) Misrepresenting to Plaintiff(s) material facts or policy provisions relating to the coverage at issue;

b) Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the Claim, even though Lloyd's liability under the Policy was reasonably clear;

c) Failing to promptly provide Plaintiff(s) with reasonable explanations of the basis in the Policy, in relation to the facts or applicable law, for Lloyd's denials of the Claim or offers of a compromise settlement of the Claim;

d) Failing within a reasonable time to affirm or deny coverage of the Claim to Plaintiff(s) or to submit reservations of right to Plaintiff(s);

e) Refusing to pay Plaintiffs' Claim without conducting a reasonable investigation with respect to the Claim;

f) Failing to provide sufficient insurance advances and temporary repair scope of work to mitigate Plaintiffs' damages.

43.     Each of the foregoing unfair settlement practices was committed knowingly by CJW and EGP, and was a producing cause of Plaintiffs' injuries and damages.

**C. COUNT THREE: PROMPT PAYMENT OF CLAIM (against Defendant Lloyd's).**

44. The Claim is under an insurance policy with Lloyd's, of which Plaintiff(s) gave Lloyd's proper notice. Lloyd's is liable for the Claim. Lloyd's violated the prompt payment of claims provisions of the TEX. INS. CODE § 542.051, *et seq.* by:

> a) Failing to acknowledge receipt of the Claim, commence investigation of the Claim and/or request from Plaintiff(s) all items, statements, and forms that Lloyd's reasonably believed would be required within the time constraints provided by TEX. INS. CODE § 542.055;
>
> b) Failing to notify Plaintiff(s) in writing of their acceptance or rejection of the Claim within the applicable time constraints provided by TEX. INS. CODE § 542.056; and/or by
>
> c) Delaying payment of the Claim following Lloyd's receipt of all items, statements, and forms reasonably requested and required, longer than the amount of time provided by TEX. INS. CODE § 542.058.

**D. COUNT FOUR: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING/BAD FAITH (against Defendant Lloyd's).**

45. Lloyd's breached the common law duty of good faith and fair dealing owed to Plaintiff(s) by denying or delaying payment on the Claim when Lloyd's knew or should have known that liability was reasonably clear. Lloyd's conduct proximately caused Plaintiffs' injuries and damages.

**E. COUNT FIVE: VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT (against all Defendants).**

46. Defendants' conduct violated the Texas Deceptive Trade Practices Act, TEX. BUS. & COM. CODE § 17.41, *et seq.* ("D.T.P.A.") by engaging in "false, misleading or deceptive acts and practices."

47. Plaintiff(s) is a "consumer" in that Plaintiff(s) acquired goods and/or services by purchase, and the goods and/or services form the basis of this action.

48.     Defendants committed numerous violations of the D.T.P.A., in so far as Defendants:

> a) Represented that goods or services have sponsorship approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;
>
> b)  Represented that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by laws;
>
> c) Failed to disclose information concerning goods or services which was known at the time of the transaction when such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;
>
> d) Generally engaged in unconscionable courses of action while handling the Claim;
>
> e)  Violated the provisions of the Texas Insurance Code described herein.

49.     Defendants took advantage of Plaintiffs' lack of knowledge, ability, experience or capacity to a grossly unfair degree and to Plaintiff's detriment.  Defendants' acts also resulted in a gross disparity between the value received and the consideration paid in a transaction involving the transfer of consideration.   As a result of the Defendants' violations of the D.T.P.A., Plaintiff(s) suffered actual damages.   In addition, Defendants committed the above acts knowingly and/or intentionally, entitling Plaintiff(s) to three times Plaintiffs' damages for economic relief.

### F. COUNT SIX: NEGLIGENCE, GROSS NEGLIGENCE AND COMMON LAW FRAUD (against all Defendants).

50.     Defendants negligently, knowingly or recklessly made false representations as to material facts and/or negligently, knowingly or recklessly concealed all or part of material information from Plaintiff(s) and/or negligently or fraudulently handled Plaintiffs' Claim, including the TF4 temporary repairs, scope and price, with the intent or foreseeable cause of inducing Plaintiff(s) to accept a denial and/or underpayment of insurance benefits, and/or cause

Plaintiff(s) injury.  Defendants allowed Plaintiff(s) to use this information, or lack thereof, in justifiable reliance in accepting denial and/or underpayment.  Plaintiff(s) relied upon said statements in accepting the denial and/or underpayment of the Claim.  Defendants' negligent, knowing or reckless conduct caused injury and damage to Plaintiff(s).

## V.
### DAMAGES

51.     Upon the trial of this case, it shall be shown that Plaintiff(s) was caused to sustain damages as a result of Defendants' conduct.  Plaintiff(s) respectfully requests the Court and jury award the amount of loss Plaintiff(s) has incurred in the past and will incur in the future.  There are certain elements of damages to be considered separately and individually for the purpose of determining the sum of money that would fairly and reasonably compensate Plaintiff(s) for the injuries, damages and losses incurred and to be incurred.  From the date of the occurrence in question until the time of trial in this cause, Plaintiff(s) seeks every element of damage allowed by Texas law with respect to the causes of action mentioned above, including but not limited to Plaintiffs' actual damages (including lost profits, loss of credit, loss of reputation, loss of use, loss of value, cost of mitigation, loss of goodwill, public adjuster's costs, and costs of repair), policy benefits (including property damage, business interruption losses and extra expenses), pre-judgment interest, post judgment interest, court costs, attorneys' fees, treble damages, statutory interest and exemplary damages.

## VI.
### CONTRACTUAL LIMITATIONS COMPLIANCE

52.     The Policy's  Commercial Property Conditions, ¶ D.2 requires that an action be brought within 2 years after the date in which the direct physical loss or damage occurred.

53.     While this Court was still considering the jurisdictional issues raised by the

Motion to Dismiss, and the issues in the Motion to Dismiss on *Colorado River* Grounds, in the Interpleader the Plaintiffs filed an action in state court under Cause No. 2010-57377, styled *Hardam S. Azad d/b/a Five Million Square Feet Companies, et. al. v. Certain Underwriters at Lloyd's, London Subscribing to Certificate No. AMR-21528, et. al.*, in the 269th Judicial District Court of Harris County, Texas on September 9, 2010.

54.     Accordingly, to the extent that Chaucer or Lloyd's, or any defendant, asserts a contractual limitation defense, Plaintiffs assert that they have filed an action within 2 years of the date of the loss and damage.

## IV.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, HARDAM S. AZAD d/b/a FIVE MILLION SQUARE FEET COMPANIES; TRADING FAIR HOUSTON, INC.;  TRADING FAIR III, INC.; TRADING FAIR IV, INC; CONTINENTAL BALLROOMS, INC.; THE TOMBALL CENTER, INC.; and WEBSTER/MARINAGATE, INC., (collectively Five Million Square Feet parties) pray that final judgment be rendered for Five Million Square Feet parties and against CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO CERTIFICATE NO. AMR-21528; CHAUCER CORPORATE CAPITAL, NO. 2 LIMITED; CRAMER, JOHNSON, WIGGINS & ASSOCIATES, INC.; and E.G.P. & ASSOCIATES, INC., (collectively Insurer parties) whereby the Insurer parties take nothing on their claims, and that final judgment be entered for Five Million Square Feet parties and against the Insurer parties, jointly or severally as may be appropriate as follows:

    1)   Actual damages;

    2)   Statutory benefits;

    3)   Treble damages;

4)  Exemplary and punitive damages;

5)  Pre-judgment interest as provided by law;

6)  Post-judgment interest as provided by law;

7)  Attorneys' fees;

8)  Costs of suit; and

9)  Such other and further relief to which Five Million Square Feet parties may be justly entitled.

DATED: October 13, 2010.

Respectfully submitted,

*/s/William F. Merlin Jr.*
William F. Merlin Jr., Esquire
Texas Bar No.:  24061793
Merlin Law Group, P.A.
777 S. Harbour Island Boulevard, Suite 950
Tampa, Florida  33602
Tel:  (813) 229-1000
Fax:  (813) 229-3692
Email: wmerlin@merlinlawgroup.com
Lead Counsel for
Defendants and Counter/Third-Party Plaintiffs

OF COUNSEL:
William F. Harmeyer
State Bar No. 09019000
Federal Bar No. 149
WILLIAM F. HARMEYER & ASSOCIATES, P.C.,
7322 Southwest Freeway, Suite 475
Houston, Texas 77074
Tel:  (713) 270-5552
Fax: (713) 270-7128
Email: wharmeyer@harmeyerlaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of October, 2010, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send a notice via e-mail transmission to:

Richard H. Gateley
BRACKET & ELLIS
100 Main Street
Fort Worth, Texas  76102-3090
*Attorney for Plaintiff*
*Chaucer Corporate Capital, No. 2 Limited*

William F. Merlin Jr.
MERLIN LAW GROUP, P.A.
777 S. Harbour Island Boulevard, Suite 950
Tampa, Florida  33602

and

William F. Harmeyer
WILLIAM F. HARMEYER & ASSOCIATES, P.C.,
7322 Southwest Freeway, Suite 475
Houston, Texas 77074
*Attorneys for Defendants and Counter/Third-Party Plaintiffs*


                                                          */s/William F. Harmeyer*
                                                          William F. Harmeyer